
Savannah Linley Ann Nelson RA-
MIREZ, An Individual Under the
Child Wrongful Death Act, By Her
Father, Stephen Ramirez, Appellant–
Plaintiff,

v.

James A. WILSON and Suzy–Q
Trucking, LLC, Appellees–
Defendants.

No. 56A04–0806–CV–356.

Court of Appeals of Indiana.

Jan. 29, 2009.

Transfer Denied April 30, 2009.

Kevin C. Smith, Kristina Kantar, Rubi-
no, Ruman, Crosmer, Smith, Sersic & Po-
len, Dyer, IN, Attorneys for Appellant.

Robert D. Hawk, Sr., Spangler, Jen-
nings & Dougherty, P.C., Merrillville, IN,
Attorney for Appellees.

## OPINION

BAILEY, Judge.

### Case Summary

Savannah Linley Ann Nelson Ramirez
("S.R."), by her father, Stephen Ramirez
("Ramirez"), appeals the trial court's grant
of partial summary judgment in favor of
James A. Wilson ("Wilson") and Suzy–Q
Trucking, LLC (collectively, "the Appel-
lees") upon a claim under Indiana's child
wrongful death statute, Indiana Code Sec-
tion 34–23–2–1 ("the statute"). We af-
firm.[1]

### Issues

Ramirez raises two issues:

I.   Whether the trial court erroneous-
ly granted partial summary judg-
ment upon a determination that a
full-term fetus is not a "child" un-
der the statute; and

II.  Whether the statute, as interpret-
ed by our Supreme Court in *Bolin
v. Wingert*, 764 N.E.2d 201 (Ind.

---

1. We held oral argument in this case in the
Indiana Supreme Court Courtroom on De-
cember 16, 2008. The panel would like to
acknowledge and thank counsel for their skill-
ful and informative advocacy.

2002), violates the privileges and immunities clause of the Indiana Constitution.

## Facts and Procedural History

On March 21, 2007, Megan Nelson ("Nelson"), who was then nine months pregnant with S.R., was driving a vehicle on State Road 10 in Newton County, Indiana. Wilson, the owner-operator of Suzy–Q Trucking, LLC, was driving a semi tractor in the opposite direction. During a passing maneuver, the vehicle and semi collided head-on. Nelson was killed and S.R. died *in utero*.

On April 10, 2007, Ramirez filed a complaint under the statute, alleging that he was S.R.'s father and that Wilson's negligence caused S.R.'s death. The Special Administrator of Nelson's estate also pursued a wrongful death claim against the Appellees for the death of Nelson.[2] On February 29, 2008, the Appellees filed a motion for partial summary judgment, asserting that the statute is inapplicable because S.R. was not born alive, and thus the Appellees were entitled to judgment as a matter of law.

On April 29, 2008, the trial court heard argument on the motion for partial summary judgment. At the conclusion of the hearing, the trial court indicated that it was bound by the *Bolin* decision to grant the motion for partial summary judgment. The trial court certified the order pursuant to Indiana Trial Rule 54(B). Ramirez now appeals.

## Discussion and Decision

### *Summary Judgment Standard of Review*

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Ind. Trial Rule 56(C). In reviewing a trial court's ruling on summary judgment, this court stands in the shoes of the trial court, applying the same standards in deciding whether to affirm or reverse summary judgment. *Hendricks Co. Bd. of Comm'rs v. Rieth–Riley Const. Co., Inc.*, 868 N.E.2d 844, 848–49 (Ind.Ct.App.2007). The party appealing the grant of summary judgment has the burden of persuading this court that the trial court's ruling was improper. *Id.* at 849. When the defendant is the moving party, the defendant must show that the undisputed facts negate at least one element of the plaintiff's cause of action or that the defendant has a factually unchallenged affirmative defense that bars the plaintiff's claim. *Indiana Michigan Power Co. v. Runge*, 717 N.E.2d 216, 226 (Ind.Ct.App.1999).

Here, the parties do not dispute the relevant facts. They agree that S.R. was a viable, full-term, yet unborn fetus at the time of her death. They disagree as to whether S.R. was a "child" under the statute. Statutory interpretation presents a pure question of law for which summary judgment is particularly appropriate. *Pike Twp. Educ. Found., Inc. v. Rubenstein*, 831 N.E.2d 1239, 1241 (Ind.Ct.App. 2005). Where the issue presented on appeal is a pure question of law, we review the matter *de novo*. *Id.*

### *Statutory Meaning of "Child"*

Ramirez contends that S.R., a full-term and viable[3] fetus, should be considered a "child" pursuant to Indiana Code Section 34–23–2–1, which provides in relevant part:

---

**2.** The Estate's claim is not part of this appeal.

**3.** Our legislature has defined viability as "the ability of a fetus to live outside the mother's womb." Ind.Code § 16–18–2–365.

**Injury or death of child; action by parent or guardian**

Sec. 1. (a) As used in this section, "child" means an unmarried individual without dependents who is:

(1) less than twenty (20) years of age; or

(2) less than twenty-three (23) years of age and is enrolled in a postsecondary educational institution or a career and technical education school or program that is not a postsecondary educational program.

(b) An action may be maintained under this section against the person whose wrongful act or omission caused the injury or death of a child. The action may be maintained by:

(1) the father and mother jointly, or either of them by naming the other parent as a codefendant to answer as to his or her interest;

(2) in case of divorce or dissolution of marriage, the person to whom custody of the child was awarded; and

(3) a guardian, for the injury or death of a protected person.

In *Bolin*, our Supreme Court reviewed a case where the plaintiff had suffered the miscarriage of an eight to ten week old fetus after an automobile accident and had brought a claim for wrongful death under the statute. The trial court granted the defendant's motion for summary judgment, and this Court affirmed the trial court. On transfer, our Supreme Court undertook "to determine the scope of the term 'child' in the Wrongful Death Statute." 764 N.E.2d at 207. Based upon the language of the statute, the Court ultimately concluded that "the legislature intended that only children born alive fall under Indiana's Child Wrongful Death Statute." *Id.*

Here, Ramirez contends that *Bolin* should not apply because the facts are distinguishable (S.R. was a full-term fetus as opposed to an eight-to-ten-week-old fetus) and because *Bolin* was wrongly decided. Although we express great sympathy with Ramirez's circumstances, we cannot grant the remedy he seeks.

In *Horn v. Hendrickson*, 824 N.E.2d 690 (Ind.Ct.App.2005), this Court was asked to determine whether *Bolin* was inapplicable where a "viable" fetus of six months gestation had died as a result of a vehicular accident. After observing that the *Bolin* Court "arguably" addressed a larger question than the facts required, the *Horn* Court concluded that the holding of *Bolin* was nevertheless clear:

> Only a child "born alive" fits the definition of "child" under the child wrongful death statute ("the statute"). [764 N.E.2d at 207.] In reaching that conclusion, the court declared a "bright line" test. Despite the salient factual difference here, namely, that Horn's fetus was viable, the *Bolin* opinion categorically precludes all parents from bringing a wrongful death claim for the death of a viable or non-viable fetus. It is not this court's role to reconsider or declare invalid decisions of our supreme court.

*Horn*, 824 N.E.2d at 694. The *Horn* Court acknowledged that Supreme Court precedent is binding until it is changed either by that court or by legislative enactment, but also observed that "our supreme court's words and opinions are not carved in stone, and it is not inappropriate for the parties or the judges of this court to ask the court to reconsider earlier opinions." *Id.* at 695.

With these precepts in mind, we will not proceed in direct conflict with the controlling precedent of our Supreme Court, and we will affirm the grant of partial summary judgment to the Appellees. Howev-

er, we urge our Supreme Court to reconsider the appropriate breadth of the *Bolin* opinion in the compelling circumstances presented here. S.R. had completed the same gestation as a typical live-born child. Had medical intervention, including a prompt Cesarean section, been available at the accident scene, S.R. would expectably have lived independent of her mother's body.

### Constitutionality

Ramirez alleges that the statute violates Article 1, Section 23 of the Indiana Constitution, the privileges and immunities clause.[4] He focuses upon differential treatment afforded to fetuses in civil law as opposed to criminal law and differential treatment afforded to mothers as opposed to fathers of unborn viable children. He does not attempt to develop an argument according to the test of *Collins v. Day*, 644 N.E.2d 72, 80 (Ind.1994) (wherein our Supreme Court established the two-part test to be applied to claims under Art. I, Section 23: First, the disparate treatment accorded by the legislature must be reasonably related to inherent characteristics which distinguish the unequally treated classes. Second, the preferential treatment must be uniformly applicable and equally available to all persons similarly situated).

To the extent that it may be said that Ramirez articulates and supports an equal privileges challenge, this Court has previously rejected such a constitutional claim. *See McVey v. Sargent*, 855 N.E.2d 324 (Ind.Ct.App.2006) (concluding that Indiana's child wrongful death statute, as interpreted by *Bolin*, does not violate the privileges and immunities clause of the Indiana Constitution nor does it violate the due process or equal protection clauses of

the United States Constitution), *trans. denied.*

As this Court has observed in *Horn*, "[j]ust as we have no authority to overrule *Bolin* directly, we cannot disregard supreme court precedent and purport to overrule *Bolin* indirectly on constitutional grounds." 824 N.E.2d at 703.

### Conclusion

Inasmuch as there exist no genuine issues of material fact, and the Appellees are entitled to judgment as a matter of law on the claim under Indiana's child wrongful death statute, the trial court properly granted partial summary judgment.

Affirmed.

BRADFORD, J., concurs.

RILEY, J., dissents with opinion.

Judge, RILEY, dissenting with separate opinion.

I respectfully dissent from the majority's decision to affirm the trial court's grant of partial summary judgment in favor of the Appellees. In essence, the majority's opinion refuses to "proceed in direct conflict with controlling supreme court precedent," while at the same time, it implicitly acknowledges that the result reached in *Bolin v. Wingert*, 764 N.E.2d 201 (Ind.2002) is wrong. *Op.* pp. 3–4.

Traditionally, based upon the doctrine of *stare decisis*, we are bound by the decisions of our supreme court until the decision is changed either by that court or by legislative enactment. *In re Petition to Transfer Appeals*, 202 Ind. 365, 174 N.E. 812, 817 (1931). In this light, *stare decisis* gives stability and continuity to our case law. However, exceptions can be made:

---

4. The "privileges and immunities" clause of the Indiana Constitution provides: "The general assembly shall not grant to ... any class

of citizens ... privileges or immunities which, upon the same terms, shall not equally belong to all citizens." Ind. Const. art. 1, § 23.

when the reasoning of a precedent is patently flawed or it has no contemporary relevance, it must be set aside.

Principles of law which serve one generation well may, by reason of changing conditions, disserve a later one. Experience can and often does demonstrate that a rule, once believed sound, needs modification to serve justice better. The adaptability of the common law to the changing needs of passing time has been one of its most beneficent characteristics. A court, when once convinced that it is in error, is not compelled to follow precedent. If, however, *stare decisis* is to continue to serve the cause of stability and certainty in the law—a condition indispensable to any well-ordered system of jurisprudence—a court should not overrule its earlier decisions unless the most cogent reasons and inescapable logic require it.

*Herald Publishing Co. v. Bill,* 142 Conn. 53, 111 A.2d 4, 8–9 (1955) (internal quotations omitted). In my opinion, *Bolin* represents a fallacy and no longer has any contemporary relevance. Judicial honesty dictates corrective action.

## I. *Individual under the Child Wrongful Death Act.*

Both the trial court's grant of Appellees' motion for partial summary judgment and the majority's decision to affirm the trial court are based on our supreme court decision in *Bolin* which instituted a bright line test that in order for the Child Wrongful Death Act to be applicable, the child has to be born alive. However, reviewing Indiana's case law on the issue, it appears that *Bolin* represents a complete turnaround of our courts' previous position.

### A. *Case Law Prior to Bolin v. Wingert*

In *Britt v. Sears,* 150 Ind.App. 487, 277 N.E.2d 20, 21 (Ind.Ct.App.1971), *reh'g denied,* this court addressed the issue of first impression whether the father of "a full term healthy male capable of independent life" but stillborn as a result of a fetal injury that occurred when the mother was nine months and one week pregnant could maintain a wrongful death action under the then applicable statute I.C. § 34–1–1–8. Researching the decisions and opinions of courts in other common law jurisdictions, the *Britt* court discovered opposite conclusions. *Id.* at 22. It noted that of the twenty-five jurisdictions who had decided the identical question, seventeen states had answered the question in the positive, while eight states held that no action could be maintained. *Id.*

Turning to the historical genesis of actions for the wrongful pre-natal death of a child, the *Britt* court approvingly quoted at length from Minnesota's supreme court decision *Verkennes v. Corniea,* 229 Minn. 365, 38 N.W.2d 838, 839 (1949). In *Verkennes,* the court rejected the premise that the unborn child is a part of the mother. *Id.* Instead, it concluded that "It seems too plain for argument that where independent existence is possible and life is destroyed through a wrongful act a cause of action arises under the statutes cited." *Id.* at 841. Nevertheless, the *Britt* court also observed that based upon a particular state's statute, several states which permit a living child to maintain an action for a tortuous injury suffered before a birth, deny a similar cause of action in case of a pre-natal injury where the child is not born alive. *Id.* at 23–24.

Recognizing that any action is purely a creature of statute, the *Britt* court turned its focus to Indiana's statute. *Id.* at 24. The statute applicable at the time of the *Britt* decision had been enacted in 1881 and gave the father the right to maintain an action for the injury or death of a child. *Id.* Interpreting the statute, the court stated that because actions for pre-natal

injuries and deaths were relatively uncommon in 1881, the legislature probably did not consider the issue before the court when using the word "child" in the statute. *Id.* at 24–25. However, the court noted that in many other instances the law did recognize the unborn child as a person. *Id.* at 25. In this light, the *Britt* court referenced early common law, Indiana's common law with regard to property and inheritance rights, and several Indiana statutes. *Id.* at 25, 26.

In concluding remarks, the court stated that "it is both just and logical to treat an unborn child who has been 280 days in gestation as having a legal being and legal personality distinct from that of its mother although it is enclosed in its mother's body and therefore dependent upon her breath for oxygen and upon her food for nourishment." *Id.* at 26. As such, the court held that " 'a full term healthy male capable of independent life' with which its mother, at the time of its death in her womb, was then nine months and one week pregnant, is a child within the meaning of the statute." *Id.* at 27. Thus, under our 1971 decision in *Britt,* parents could bring a wrongful death action against a tortfeasor for causing the death of their unborn child capable of independent life.

The following year, our supreme court decided *Cheaney v. State,* 259 Ind. 138, 285 N.E.2d 265 (1972), *cert. denied,* 410 U.S. 991, 93 S.Ct. 1516, 36 L.Ed.2d 189 (1973), in which the court upheld a criminal abortion conviction.[5] In its opinion, the supreme court observed that throughout the years, unborn children gained rights in different areas of the law. *Id.* at 270. Specifically, the supreme court analyzed an unborn child's rights in the area of property (*Id.* at 267), support (*Id.* at 269), and a mother's medical wishes in light of

freedom of religion (*Id.* at 269). Most notably, in the field of torts, the *Cheaney* court noted that "it was held for many years that the unborn child was part of the mother and no recovery was allowed for the injury to the unborn child.... However, as we gained more knowledge medically, legal attitudes started changing." *Id.* at 268. In its analysis, the supreme court approvingly referenced the *Britt* case as "holding that a father could maintain an action for the wrongful death of a stillborn child." *Id.* As in *Britt,* our supreme court also stated that "many of the cases cling to a viability distinction whereby a recovery is allowed only if the unborn child is viable." *Id.* However, pointing to advances in the medical field, the *Cheaney* court also noted that a number of cases have rejected the viability distinction when allowing recovery for injuries to an unborn child. *Id.* Interestingly, the *Cheaney* court appeared to lean towards taking the *Britt* decision one step further by, after quoting several out-of-state decisions, concluding that "[i]t is clear that the legal distinction of viability in the field of torts is losing acceptance as we gain more knowledge that biologically it is merely an arbitrary distinction." *Id.* at 269.

For the next thirty-one years, until our supreme court handed down *Bolin* in March of 2002, the *Britt* decision would govern any action for the wrongful death of an unborn child capable of independent life. As shown above, prior to *Bolin,* Indiana's courts were focused on protecting the rights of the unborn.

### B. *Bolin v. Wingert*

In *Bolin v. Wingert,* 764 N.E.2d 201, 203 (Ind.2002), Rebecca Bonn's car was struck from behind by a vehicle driven by Wingert. The impact proximately caused Bo-

---

**5.** Interestingly, our supreme court decided *Cheaney* six months before the United States Supreme Court *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973).

lin to miscarry her eight-to ten-week-old fetus. *Id.* The trial court granted Wingert's motion for summary judgment on the Bolins' claim for the wrongful death of their unborn child. *Id.* The Bolins appealed. *Id.*

On appeal, the court of appeals based its analysis on the *Britt* decision. *Bolin v. Wingert,* 742 N.E.2d 36 (Ind.Ct.App.2001). Focusing on the "viability" element of *Britt,* the court of appeals concluded that no evidence was presented establishing that the Bolins' unborn child was capable of independent life. *Id.* at 38. As such, the Child Wrongful Death Act was not applicable. *Id.*

Our supreme court affirmed but for different reasons. In the first and second sentences of its unanimous opinion, the supreme court states: "In a case of first impression under Indiana's Child Wrongful Death Statute, we address the question whether an eight-to ten-week-old fetus fits the definition of 'child.' We conclude that it does not." *Bolin,* 764 N.E.2d at 203. Recognizing the different and uniquely drafted wrongful death statutes of other states, the *Bolin* court divided all case law into four groups: (1) recovery is permitted but only for the death of children born alive; (2) recovery is permitted for the death of viable unborn children; (3) recovery is permitted for the death of unborn children that are quick [6]; and (4) recovery is permitted for the death of any unborn child. *Id.* at 205.

Turning to Indiana's statute, the court noted the statute's inclusion of an upper age limit and its omission of a lower age limit. *Id.* Acknowledging that the *Britt* court relied exclusively on policy and logic, the supreme court noted that because of the 1987 revisions to the Child Wrongful Death Act the court could now consider the intent of the legislature as expressed by the provisions it added to the Indiana Code. *Id.* at 206. In concluding that the term "child" only includes children born alive, the *Bolin* court addressed four "concepts" that appear in the statute's definition of a "child": "an (1) unmarried, (2) individual, (3) without dependents, (4) who is less than twenty years of age." *Id.* The court stated that those terms "tend to indicate the legislature contemplated that only living children would fall within the definition of 'child.'" *Id.* As a result, the *Bolin* court instituted a bright line test that only a child born alive fits the definition of "child" under the Child Wrongful Death Act. *Id.* at 207. It categorically precludes all parents from bringing a wrongful death claim for the death of a viable or non-viable, unborn child.

### C. *Post–Bolin Case Law*

Three years after the *Bolin* decision, this court issued its well-reasoned opinion in *Horn v. Hendrickson,* 824 N.E.2d 690 (Ind.Ct.App.2005), wherein the mother filed a claim under Indiana's Child Wrongful Death Act for the death of her viable, six-month old fetus as a result of an automobile accident. Although the *Horn* court followed *Bolin* with regard to the wrongful death claim, the opinion itself amounts to an extensive and forceful criticism of *Bolin's* analysis and result. Stating that "it is not this court's role to reconsider or declare invalid decisions of our supreme court," the *Horn* court points to several examples where our supreme court revisited previously decided issues. *Id.* at 694–95. Noting that it nevertheless would be following the *Bolin* precedent, the *Horn* court stated that "we write to explain why

---

**6.** A child is considered "quick" when the fetus "is able to move in its mother's womb."

*Bolin,* 764 N.E.2d at 205 n. 6.

we believe the court should reconsider the *Bolin* opinion." *Id.* at 694. The *Horn* court continues by formulating three main criticisms to the *Bolin* decision.

First, "an examination of the *history of the statute,* together with Indiana's two other wrongful death statutes, supports a conclusion that our legislature intended to permit recovery not only for the death of children born alive but also for the death of viable unborn children." *Id.* at 696. For many years prior to its recodification in 1987, the original Child Wrongful Death Act did not include a definition of "child." *Id.* at 696. As a result, the *Britt* court interpreted the statute and concluded that parents could bring a wrongful death action against the tortfeasor for causing the death of their unborn child capable of independent life. *Id.* at 697.

Following the *Britt* decision, the *Horn* court notes our supreme court opinion in *Miller v. Mayberry,* 506 N.E.2d 7, 12 (Ind. 1987), which reaffirmed Indiana's long-standing pecuniary loss rule that damages for the loss of love and affection of a child were not compensable in an action for the wrongful death of a minor child. *Id.* However, only one month after the *Miller* opinion, our legislature approved Public Law 306–1987, which significantly amended the original the Child Wrongful Death Act. *Id.* These 1987 amendments are important for two reasons: (1) the legislature included a definition of "child" (which is the same as in the current statute), and (2) the legislature expanded the damages recoverable under the statute to now include damages for the loss of the child's love and companionship. *Id.*

Based on this statutory history, the *Horn* court concludes that "in 1987, when the legislature expanded the scope of recovery under the statute beyond the pecuniary loss rule and defined 'child,' the statute unmistakably superseded *Miller* but

did not likewise repudiate our holding in *Britt,*" which had been Indiana's precedent since 1971 and had been on the books for more than fifteen years by the time the legislature amended the statute in 1987. *Id.* at 698.

The *Horn* court's second criticism of *Bolin* revolves around the doctrine of *Statutes in Pari Materia.* *Horn* blatantly states that the *Bolin* decision did not apply this doctrine and failed to construe the Child Wrongful Death Act in light of related statutes. *Id.* Pointing to the Adult Wrongful Death statute, enacted in 1999, *Horn* notes that an "adult person" is defined as an unmarried individual who does not have dependents and who is not a child. *Id.* Moreover, in order for a parent or child of the adult person to recover damages, the parent or child has the burden of proving a genuine, substantial, and on-going relationship with the adult person. *Id.* Reading the statutes together, the *Horn* court concludes that the terms of the Child Wrongful Death Act (unmarried, without dependents, less than twenty years of age and … enrolled in an institution of higher education or vocational training) were included to avoid the enactment of redundant statutes and the duplication of wrongful death claims. *Id.* at 699.

Lastly, the *Horn* court focuses on the pivotal word *"individual,"* as included in the statute. Initially, *Horn* notes that by definition an individual is a viable fetus and states that our legislature has already defined viability to mean "the ability of a fetus to live outside the mother's womb." *Id.* at 700; I.C. § 16–18–2–365. Furthermore, advances in obstetrics and neonatology have compelled courts in all jurisdictions to abandon the early common law doctrine that a fetus and its mother are a single entity.

Carefully delineating the issue before it, the *Horn* court indicates that "this case is not about a zygote or an embryo or when life begins," but about the rights of parents. *Id.* "The issue is not whether a viable fetus is a 'person' but whether it is an 'individual' under the statute. We believe that it is." *Id.* Disputing *Bolin's* interpretation, *Horn* points out that *Bolin* leads to incongruous results: under Bolin, a person whose wrongful act results in the death of a viable fetus owes no civil duty to the parents and is not a tortfeasor, even if that same person is convicted of feticide based on the same facts. *Id.* at 701.

In light of these three criticisms, the *Horn* court concludes with a forceful rebuke directed at our supreme court. "The holding in *Bolin* that parents in Indiana cannot recover for the wrongful death of a viable fetus is a return to the 19th century when, in tort law, a fetus and its mother were considered one and the same." *Id.*

It is abundantly clear that the *Bolin* decision no longer has any contemporary value and requires modification to serve justice better,[7] especially when a viable fetus is concerned. Therefore, I would vote to reverse the trial court in its grant of partial summary judgment to Appellees.

## II. *Constitutional Challenge*

With regard to Ramirez' argument that differential treatment is afforded to mothers as opposed to fathers of unborn children in violation of Article I, Section 23, the Privileges and Immunities Clause of the Indiana Constitution, the majority relies on *McVey v. Sargent*, 855 N.E.2d 324 (Ind.Ct.App.2006) to deny his challenge.

In *Collins v. Day*, 644 N.E.2d 72, 80 (Ind.1994), our supreme court established the following two-part test to be applied to claims under Art. I, Section 23:

> First, the disparate treatment accorded by the legislature must be reasonably related to inherent characteristics which distinguish the unequally treated classes. Second, the preferential treatment must be uniformly applicable and equally available to all persons similarly situated.

As the court further explained in *Collins*, legislative classification under Art. I, Section 23 must be "based upon substantial distinctions germane to the subject matter and the object to be attained." *Id.* at 78. In other words, "[t]he distinctions must involve something more than mere characteristics which will serve to divide or identify a class. There must be inherent differences in situations related to the subject-matter of the legislation which require, necessitate, or make expedient different or exclusive legislation with respect to the members of the class." *Id.*

Although the majority relies on *McVey*, a similar argument was addressed in *Horn.* Specifically, *Horn* analyzed whether the Child Wrongful Death Act, violates Indiana's Equal Privileges and Immunities Clause when it differentiates between parents of a child born alive and parents of a viable fetus. *Horn*, 824 N.E.2d at 701.

---

7. I note that Senate Bill 341, introduced in the 2009 legislative session, proposes to amend Ind Code § 34–23–2–1 specifying that the statutory term "child" should include "a fetus that has attained viability." If successful, a wrongful death action could then be maintained against the person whose wrongful act or omission caused the injury or death of a viable fetus.

In addition, House Bill 1069, proposed in the 2009 legislative session, attempts to amend I.C. § 6–3–1–3.5 to include a tax deduction for a stillborn child. At the time of this dissent, the proposed amendment provides a $1,000 deduction from adjusted gross income for "each birth during the taxable year of a stillborn child of the taxpayer for which a certificate of birth resulting in stillbirth is issued under IC 16–37–1–8.5."

The *Horn* court answered this question in the affirmative. *Id.* Emphasizing that the Act confers rights on the *parents,* not on the children, the *Horn* court noted that both groups of parents have the same interest at stake, namely, the wrongful death of their child, and they suffer the same loss. *Id.* at 702. However, in dicta, the *Horn* court addressed the question raised by Ramirez today—different treatment of mother versus father—and stated that "[w]e can discern no legitimate explanation for such disparate treatment that is reasonably related to the characteristics that distinguish fathers from mothers of unborn viable children. But that is a question left for another day." *Id.* at 703.

*McVey,* almost in passing, also analyzed the issue raised by Ramirez, and determined that inherent characteristics existed that warranted the different treatment under Article I, Section 23 of the Indiana Constitution. *McVey,* 855 N.E.2d at 328. *McVey's* sole argument rested on the premise that "[w]hen a mother's damages from another's negligence include a miscarriage, she has suffered resulting physical pain and medical treatment; a father has not." *Id.*

While I recognize that I voted with the majority in *McVey,* now, after renewed contemplation, I find that *McVey* was wrongly decided. I believe that *McVey's* reasoning does not satisfy the *Collins* test. *See Collins,* 644 N.E.2d at 80. *Collins* explicitly mandates that the legislative classification "must involve something more than mere characteristics which will serve to divide or identify a class. There must be inherent differences in situations related to the subject-matter of the legislation which require, necessitate, or make expedient different or exclusive legislation with respect to the members of the class." *Id.* As such, "the physical pain and medical treatment" suffered by a mother amount

to the physical characteristics that identify mothers from fathers. Inherently, both mother and father are a parent, eagerly awaiting the arrival of a child and looking forward to holding a newborn. Due to negligence of another, both mother and father lose a child. Like the *Horn* panel, I can perceive no legitimate reason to enforce disparate treatment between the mothers and fathers of viable, unborn children.

In light of this dissent, the *Horn* decision, and this majority's decision, I implore the parties here to seek transfer to the supreme court, requesting a modification of its *Bolin* decision.